UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BETTY JONES,

               Plaintiff,

-against-

BUFFALO STATE UNIVERSITY; JANELLE
A. BROOKS, as Dean of Students & Officer in
Charge; TIMOTHY W. GORDON, sued in his
individual capacity; and JULIA R. COLLETT,
sued in her individual capacity,

               Defendants.

**Case No.**

**COMPLAINT**

## PRELIMINARY STATEMENT

1.     Plaintiff Betty Jones[1] (Ms. Jones), a former student, brings this action against

Buffalo State University and its officers/agents/employees seeking redress for a brutal and

wholly unjustified suspension, near instantaneous eviction from her campus residence, and

dismissal on the basis that she was living with the human immunodeficiency virus (HIV) while

in a relationship with another student.  Defendants' unfounded fears and stigmatizing views of

people living with HIV caused them to make a wildly inaccurate determination that Ms. Jones

posed a safety risk to the campus.  Defendants' unfounded and perfunctory ejection of Ms. Jones

resulted in severe emotional harm and lost opportunities, and has had devastating impacts on her

life.  As redress for Defendants' discriminatory conduct, Ms. Jones seeks a declaration that

_____

[1] Plaintiff is identified by a pseudonym to preserve her confidentiality. A motion to seal a party
has been filed contemporaneously with this complaint.

Defendants violated the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Fair Housing Act, the New York State Human Rights Law, and the Code of the City of Buffalo; along with compensatory damages, injunctive relief, and attorneys' fees and costs.

2.      Since at least 2017, federal and state public health authorities have publicly established that treatment with medication can suppress the virus in almost all people living with HIV, and that people who are "virally suppressed"—also known as having an "undetectable" viral load—cannot transmit the virus to others through sexual contact.[2]  The New York State Department of Health reports that in September 2017, New York was the first state to sign on to the Prevention Access Campaign Undetectable=Untransmittable (U=U) Consensus Statement.[3]

3.      Federal and state public health campaigns like U=U seek to bring people into testing and treatment by informing them that treatment can render the infection untransmittable.

4.      Despite this remarkable, revolutionary, and now well-established advance in treatment and prevention, many people avoid getting tested for HIV because of the stigma and discrimination they fear they would face after a positive test result.[4]

---

[2] Eugene McCray, *HIV/AIDS in the United States*, U.S. Ctr. for Disease Control and Prevention (Sept. 27, 2017), https://docs.wixstatic.com/ugd/de0404_1f9f737da1674cdda5a42f7857cd4fa6.pdf [https://perma.cc/7LQD-6LAV].

[3] *U=U Policy Statement*, N.Y. St. Dep't of Health AIDS Inst. (Nov. 2018), https://www.health.ny.gov/diseases/aids/ending_the_epidemic/docs/u=u/policy_statement.pdf [https://perma.cc/2S2J-L75Q] ("The U=U Consensus Statement affirms that people living with HIV (PLWH) who have achieved and continue to maintain an undetectable viral load do not sexually transmit HIV").

[4] A national survey of young adults found that more than half would be uncomfortable having a roommate with HIV (51%) or having their food prepared by someone with HIV (58%). *National Survey of Young Adults on HIV/AIDS*, Kaiser Fam. Found. (Nov. 2017), https://files.kff.org/attachment/Report-National-Survey-of-Young-Adults-on-HIV/AIDS [https://perma.cc/SL5G-LVZG].

5.      For decades, people living with HIV have faced discriminatory treatment in jobs, housing, public accommodations, and even healthcare settings.  People living with HIV also can be the subject of verbal and physical abuse and social rejection and exclusion.  Stigma and discrimination can make it harder for people living with HIV to maintain income, housing, quality of life, education, and access to care.

6.      Women living with HIV are frequently abused when they disclose their HIV status to their partners.  This remains the case despite the monumental advances in treatment that can suppress the virus in the body so completely that a person cannot transmit the virus through sexual contact.

7.      New York State Department of Health's partner services program helps people decide how to talk to their partners about HIV.  An information sheet produced by the program states, "If you do not feel comfortable talking with your partners, don't.  If you think your partner might hurt you, it is important **not** to tell them about an STI/HIV exposure, or at least wait until a later time."[5]

8.      In September 2022, Ms. Jones was an 18-year-old, first-year college student, attending Buffalo State College, and living with virally suppressed HIV.  The amount of virus in her body was undetectable, so she could not transmit the virus.  Based on conversations with her doctor, Ms. Jones knew that she could not transmit the virus.

9.      At all times relevant to this complaint, Ms. Jones took her antiretroviral treatment every day, and she remained virally suppressed.  In other words, she was managing her HIV

---

[5] *Helpful Information to Identify Partners*, N.Y. Dep't of Health (last revised Aug. 2023), https://www.health.ny.gov/diseases/communicable/std/partner_services/helpful_information.htm [https://perma.cc/Z92F-NDYM].

disease responsibly.  While she was sexually active, she was very careful to ensure that she did not put her sexual partners at risk, and given that she was virally suppressed, she could not transmit the illness to a sexual partner as a matter of medical fact.

10.     Ms. Jones wanted to tell a student she was dating that she was living with HIV but, knowing the pervasive stigma against people living with HIV, she worried a great deal about his reaction.  When she gathered the courage to disclose that she was living with HIV, her worst fears were realized.  The student was verbally abusive and told her he wanted terrible things to happen to her.

11.     Afraid for her safety, Ms. Jones visited the campus police office and told them that she had disclosed her HIV status to her sexual partner.  She expressed fear for her safety.

12.     Buffalo State's response from this moment onward was based on stigma about Ms. Jones' disability and lacked any medical, scientific, or rational basis.  Defendants used emergency procedures to quickly evict Ms. Jones from her residence hall, suspend her, and prohibit her from setting foot on the campus without conducting an individualized assessment of Ms. Jones and her circumstances.

13.     In February 2023, Buffalo State permanently dismissed Ms. Jones from the college.

14.     Defendants' actions had profound consequences for Ms. Jones: she became homeless, her college education was derailed, and her professional goals were indefinitely delayed and rendered infinitely more difficult to achieve.  Defendants' discriminatory acts also caused Ms. Jones deep mental anguish and affected her health and well-being.

15.     Ms. Jones brings this action for injunctive relief, including the removal of the notation of "judicial dismissal" on her transcript, and for monetary compensation.

4

## THE PARTIES

16.     Plaintiff BETTY JONES, age 20, resides in the Bronx, New York.  She is Black.
Her impairment, HIV, substantially limits her major life activities, including functions of the
immune system, which are major bodily functions.  Additionally, Defendants regarded Ms. Jones
as having a disability, and she has a record of an impairment, HIV.  Accordingly, Ms. Jones has
a disability within the meaning of federal, state, and local anti-discrimination laws.

17.     Ms. Jones is identified by pseudonym to protect her from the stigma,
discrimination, emotional distress, and hardship that could result from publicly disclosing her
identity and HIV status.  A motion to seal a party has been filed contemporaneously with this
complaint.

18.     Defendant BUFFALO STATE UNIVERSITY (Buffalo State or the school),
formerly Buffalo State College, is a public university and part of the State University of New
York (SUNY).  The school is located at 1300 Elmwood Avenue, Buffalo, NY 14222.  Buffalo
State became a university in January 2023.

19.     On information and belief, at all times relevant to this action, Defendant Buffalo
State received federal financial assistance.  On information and belief, Defendant Buffalo State
agreed to receive funds from the federal government in exchange for, among other things,
promising to refrain from discriminating against otherwise qualified individuals with a disability.
Ms. Jones is an intended third-party beneficiary to that agreement and an otherwise qualified
individual with a disability.

20.     Defendant JANELLE A. BROOKS, sued in her official capacity, is the Dean of
Students & Officer in Charge.  The Dean of Students oversees the areas of Residence Life,
Student Conduct and Community Standards, Student Leadership and Engagement, and the

Inclusion and Equity Office.  Ms. Brooks is the former Associate Dean of Students, Student Conduct and Community Standards.

21.     Defendant TIMOTHY W. GORDON, sued in his individual capacity, is the former Vice President of Student Affairs at Buffalo State.  On information and belief, Defendant Gordon had ultimate supervisory authority over Defendant Julia R. Collett and other individuals involved in this action, including former Dean of Students, Sarah Young.  On information and belief, Defendant Gordon had authority to act on behalf of the President of Buffalo State.  On information and belief, Mr. Gordon resides in Buffalo, New York.

22.     Defendant JULIA R. COLLETT, sued in her individual capacity, is the former Assistant Director for Residence Life at the Residence Life Office at Buffalo State.  On information and belief, Ms. Collett resides in Amherst, New York.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state and local law.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in Buffalo, New York, within the Western District of New York.

## STATEMENT OF FACTS

25.     In 2022, Ms. Jones matriculated at Buffalo State as a first-year student in SUNY's Educational Opportunity Program (EOP).  Her major was criminal justice.

26.     The EOP provides access to college for students who are both economically and educationally placed at a disadvantage and supports EOP students with a counselor who provides academic and personal support.

27.     As an 18-year-old without financial support from her parents, Ms. Jones required financial aid to attend college.  Buffalo State awarded her financial aid in the form of grants and loans and accepted her into on-campus housing.  Ms. Jones obtained a job at a store on campus because her aid was not sufficient to pay the full cost of tuition, room, and board, and she was prepared to work her way through college.

28.     Before starting the fall semester, Ms. Jones completed a Buffalo State summer program, earning four credits and a 3.16 GPA.  For the fall, she enrolled in four classes, which would have earned her a total of twelve credits.  Classes began on or around August 29, 2022.

29.     She lived in campus housing during the summer and moved into a new campus residence before the start of classes.  When she moved into campus housing, Ms. Jones' dormitory was her primary residence.

30.     When she arrived at college, Ms. Jones had been taking HIV antiretroviral medication for years.  She had a "durably undetectable" HIV viral load.

31.     A "durably undetectable" HIV viral load means that a person has had undetectable test results, and that the virus had remained undetectable for at least six months after a first undetectable test result.[6]

32.     At all times relevant to this action, Ms. Jones took her medication daily.

_____

[6] 10 Things to Know About HIV Suppression, Nat'l Inst. of Health (last revised Feb. 2024) https://www.niaid.nih.gov/diseases-conditions/10-things-know-about-hiv-suppression [https://perma.cc/P7R2-EF7G].

33.     Because she had achieved and maintained a durably undetectable viral load, there was no risk that she could sexually transmit the virus to another person not living with HIV.

34.     The absence of transmission risk for people with a durably undetectable viral load is well-established.  The U.S. Centers for Disease Control and Prevention formally announced in 2017 that when antiretroviral therapy results in viral suppression, it prevents sexual HIV transmission.[7]

35.     Based on conversations with her doctor, Ms. Jones knew that she could not transmit the virus through sexual contact.

36.     Ms. Jones was dating other students.  During the second week of school, she felt close to one student in particular and, after beginning a sexual relationship with him, told him she was living with HIV.  She told him she was taking medication and tried to explain that she could not transmit the virus to him.

37.     In response to her disclosure, the student became very angry and verbally abusive.

38.     He sent her vicious text messages, calling her a "hoe" and a "bitch," and threatening to end her college education and get her sent to prison.  He texted, "do[ing] this to the wrong person can lead to serious issues."

39.     Fearing that the student might try to harm her, on or about September 9, 2022, Ms. Jones went to the office of the Buffalo State University Police Department (UPD) for help. She explained that she had disclosed her HIV status to a male student whom she was dating and that he had threatened her.

---

[7] McCray, *supra* note 2.

40.     UPD discussed the matter with a Residence Life representative, as well as Ms. Jones and the male student.  The students agreed to stay out of each other's lives.

41.     The male student filed a complaint with UPD against Ms. Jones two days later. Steven W. Cahoon, a UPD investigator, began investigating the case.  The male student had already reported to UPD officers that Ms. Jones was taking medication to treat her HIV.

42.     On September 14, 2022, UPD met with Ms. Jones again.  Ms. Jones told UPD investigators or officers that she takes medication every day to eliminate the risk of HIV transmission and that she cannot transmit the virus through sexual contact.

43.     The UPD officers told Ms. Jones to expect a no-contact order from Residence Life, between her and the male student, but that her future on campus was up to "other entities."

44.     Later that day, Defendants and Dean Young[8] informed Ms. Jones that the school was terminating her housing assignment and suspending her, "effective immediately," allegedly due to "health and safety incidents" and a "health and safety violation" on September 9, 2022.

45.     These decisions were approved by Vice President for Student Affairs Timothy W. Gordon, as designee of the President.  Several other college officials, including then President Katherine S. Conway-Turner and Janelle Brooks, were informed of these decisions.

46.     Julia Collett, then Assistant Director for Residence Life, instructed Ms. Jones not to contact the male student, and that she must vacate her room that same day.  The suspension prohibited Ms. Jones from entering or remaining on campus.  Even without Collett's official housing termination, the interim suspension decision banning Ms. Jones from campus effectively evicted her entirely, by prohibiting her from returning to her home on campus.

---

[8] Ms. Young is now deceased.

47.     Shortly after Defendants informed Ms. Jones of these actions, UPD placed Ms. Jones under arrest, charging her with two misdemeanors.  These charges were later dismissed.

48.     Individuals from the Residence Life Office and UPD escorted Ms. Jones to her campus residence to obtain a few belongings before her ejection from the residence.  Other students witnessed Ms. Jones' being escorted by campus police across the campus that afternoon. This exposure was humiliating for Ms. Jones.  She had to leave many of her possessions in the dorm room.

49.     UPD then brought Ms. Jones to a bus stop just outside the edge of campus and left her there.

50.     Because Ms. Jones' medication prevented the sexual transmission of HIV, she did not in fact create a health or safety risk to anyone in her residence hall or on the campus.

51.     Defendants had no medical, scientific, or rational basis to evict Ms. Jones from her housing or to suspend her from the school.  Instead, Defendants' decisions were based on stigma, outdated assumptions, baseless fears, and prejudice about people living with HIV and the risks associated with them.  Defendants knew or should have known that Ms. Jones' HIV status did not pose a risk to the health or safety of her sexual partner or others at the school.  Moreover, Defendants' decisions were contrary to New York Department of Health guidelines and policy.

52.     Defendants did not request additional information from Ms. Jones.  Defendants could have asked Ms. Jones for information from her doctor about her viral load and the (im)possibility of transmission, but they did not do so.

53.     Ms. Jones repeatedly explained that she could not transmit the virus.  Even if she had not done so, Defendants had an obligation to make an individualized assessment of any risk

she might have posed, and they all failed to do so.  If they had done so, they would have learned that Ms. Jones—a student living with HIV—posed no threat of any kind to anyone on campus.

54.     The overarching purpose of the disability laws is to ensure against discrimination based upon stigma, unfounded or outdated assumptions, prejudices, and stereotypes regarding disabled individuals.  Defendants' failure to conduct an individualized assessment of Ms. Jones' disability resulted in precisely this form of discrimination.

55.     On September 15, 2022, the morning after she was evicted and suspended, Ms. Jones spoke with Dean Young and told her she was virally suppressed and could not transmit the virus.

56.     Later in the morning on September 15, Ms. Jones again informed UPD, Young, and Dr. Philip Badaszewski, then Assistant Dean of Residence Life, that she "maintain[s] an undetectable viral load and that I absolutely have no risk of sexually transmitting the virus to someone that is negative."

57.     On September 26, 2022, counsel from the Legal Action Center wrote to SUNY's then General Counsel, Anta Cissé-Green, explaining in detail why there was "no medical, scientific, or legal justification for Buffalo State's disciplinary actions against Ms. [Jones] or her arrest," and that the school's actions constituted disability discrimination under federal, state, and local law.  Sent on Ms. Jones' behalf, and copied to officials at Buffalo State, including Gordon and Collett, the letter requested, among other things, her immediate reinstatement and reintegration into the school and the dropping of all disciplinary charges.

58.     In response to these communications, Defendants could have rescinded or terminated the interim suspension and invited Ms. Jones to move back into her campus housing.

They chose not to do so.  After presiding over a student conduct proceeding, Dean Brooks notified Ms. Jones of her permanent dismissal from the school.

59.     Again, Defendants willfully chose to ignore the scientific information about HIV transmission provided to them by Ms. Jones, provided by her counsel, and otherwise available to them through public sources, including governmental and other public health agencies.

60.     Instead, Defendants relied solely on the fact of Ms. Jones' HIV status to summarily and erroneously conclude that her presence on campus and in campus housing created a health and safety risk.

61.     Defendants' eviction directly and proximately caused Ms. Jones to lose the only housing she had, to become homeless, and to lose her belongings.  She was forced to stay in a shelter.

62.     Defendants' suspension and dismissal directly and proximately caused Ms. Jones to lose her opportunity for an education, and to derail, delay, and render far more difficult the attainment of her professional goals.

63.     In addition, Ms. Jones had incurred debt and obtained a Pell grant so she could attend Buffalo State, but Defendants prevented her from realizing the full benefit of this financial aid.

64.     Defendants did not refund Ms. Jones' federal student loans or her Pell grant.  This debt and the Pell grant affect Ms. Jones' future eligibility for financial aid.

65.     As a direct and proximate result of Defendants' actions, Ms. Jones experienced loss of housing, loss of educational opportunity, and substantial emotional pain and anguish, including embarrassment, shame, humiliation, sadness, and anxiety, including about her housing, education, and her future.

12

## FIRST CAUSE OF ACTION
## TITLE II OF THE AMERICANS WITH DISABILITES ACT, 42 U.S.C. § 12132
### Against Buffalo State University and Janelle A. Brooks
### as Dean of Students and Officer in Charge

66.     Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

67.     Title II of the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

68.     At all times relevant to this action, Ms. Jones has been an individual with a disability within the meaning of the ADA.  42 U.S.C. § 12102.  She also has had a record of an impairment, HIV, and Defendants regarded her as having a disability.

69.     At the time of the discriminatory conduct alleged herein, Ms. Jones was a "qualified individual with a disability" because she was enrolled at Buffalo State and Buffalo State deemed her qualified for and provided her with housing on campus.  42 U.S.C. § 12131(2).

70.     At all times relevant to this action, Defendant Buffalo State University has been a public entity within the meaning of the ADA.  42 U.S.C. § 12131(1).

71.     Defendants discriminated against Ms. Jones by excluding her from participation in or denying her the benefits of its services, programs, or activities, or subjecting her to discrimination by reason of her disability, in violation of Title II of the ADA and its implementing regulations.  42 U.S.C. § 12132 and 28 C.F.R. § 35.101 et seq.

72.     Defendants' violation of the ADA was motivated by discriminatory animus or ill will and constituted deliberate indifference.

73.     Ms. Jones suffered substantial damages as a direct, proximate, and foreseeable result of Defendants' discriminatory conduct and deliberate indifference, including its eviction, suspension, and permanent dismissal of Ms. Jones.

74.     Ms. Jones is entitled to injunctive relief, damages, attorneys' fees, and costs as a result of Defendants' discriminatory conduct and deliberate indifference, pursuant to 42 U.S.C. §§ 12133, 12205, and/or common law.

## SECOND CAUSE OF ACTION
## SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794
### Against Buffalo State University

75.     Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

76.     Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

77.     At the time of the discriminatory conduct alleged herein, Ms. Jones was a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act.

78.     At the time of the discriminatory conduct alleged herein, Ms. Jones was an "otherwise qualified individual with a disability" because she was enrolled at Buffalo State, and Buffalo State deemed her eligible for, and provided her with, housing on campus.

79.     Buffalo State is a public entity.  The school is subject to the Rehabilitation Act because it is a "program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

14

80.     Defendant Buffalo State discriminated against Ms. Jones, solely by reason of her disability, by excluding her from participation in its programs or activities, denying her the benefits of its programs or activities, and otherwise subjecting her to discrimination, in violation of the Rehabilitation Act and its implementing regulations.  Defendant Buffalo State's violation of the Rehabilitation Act constituted intentional discrimination and deliberate indifference.

81.     Ms. Jones suffered substantial damages as a direct, proximate, and foreseeable result of Defendant Buffalo State's discriminatory conduct and deliberate indifference, including its eviction, suspension, and permanent dismissal of Ms. Jones.

82.     Ms. Jones is entitled to injunctive relief, damages, attorneys' fees, and costs as a result of Defendant Buffalo State's discriminatory conduct and deliberate indifference, pursuant to 29 U.S.C. § 794a.

### THIRD CAUSE OF ACTION
### THE FAIR HOUSING ACT, 42 U.S.C. § 3604(f)(1)
### Against Defendants Collett and Gordon, in Their Individual Capacities

83.     Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

84.     The Fair Housing Act (FHA) imposes a personal duty not to discriminate by making it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of (A) that buyer or renter."  42 U.S.C. § 3604(f)(1)(A).

85.     Defendants Collett and Gordon are directly liable for their conduct resulting in discriminatory housing practices and their failures to take prompt action to correct discriminatory actions by others.

86.     At all times relevant to this action, Defendants' campus housing constituted dwelling units designed and intended for occupancy as residences by individuals and are subject to the FHA pursuant to 42 U.S.C. §3602(b) and 24 C.F.R. § 100.201.

87.     At all times relevant to this action, Ms. Jones has been a person with a "handicap" within the meaning of the FHA.  42 U.S.C. § 3602(h); 24 C.F.R. § 100.201.

88.     At the time of the discriminatory conduct alleged herein, Ms. Jones was qualified for and deemed eligible for Defendants' campus housing as a student enrolled full-time at Buffalo State.

89.     Defendants Collett and Gordon discriminated against Ms. Jones in the rental of campus housing, made housing unavailable to her, and/or denied her access to housing because of her handicap of HIV, in violation of the FHA and its implementing regulations. 42 U.S.C. § 3604(f).

90.     Following the discriminatory conduct alleged herein, Defendants have continued to offer, rent, and otherwise provide campus housing to others.

91.     As a direct and proximate result of Defendants' discriminatory conduct in violation of the FHA, Ms. Jones has suffered and continues to suffer substantial damages.

92.     Defendants' conduct was willful, intentional, and in reckless disregard of Plaintiff's civil rights.

93.     Ms. Jones is entitled to actual and punitive damages, attorneys' fees, and costs as a result of Defendants' discriminatory conduct, pursuant to 42 U.S.C. § 3613(c).

**FOURTH CAUSE OF ACTION**
**THE FAIR HOUSING ACT, 42 U.S.C. § 3604(f)(2)**
**Against Defendants Collett and Gordon, in Their Individual Capacities**

94.     Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

95.     The FHA provides that it is illegal "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling" because of disability.  42 U.S.C. § 3604(f)(2).

96.     At all times relevant to this action, Defendants' campus housing constituted dwelling units designed and intended for occupancy as residences by individuals and are subject to the FHA pursuant to 42 U.S.C. §3602(b) and 24 C.F.R. § 100.201.

97.     At all times relevant to this action, Ms. Jones has been a person with a "handicap" within the meaning of the FHA. 42 U.S.C. § 3602(h); 24 C.F.R. § 100.201.

98.     At the time of the discriminatory conduct alleged herein, Ms. Jones was qualified for and deemed eligible for Defendants' campus housing as a student enrolled full-time at Buffalo State.

99.     Defendants Collett and Gordon discriminated against Ms. Jones by discriminating in the terms and conditions of the rental of campus housing because of her disability.

100.    Following the discriminatory conduct alleged herein, Defendants have continued to offer, rent, and otherwise provide campus housing to others.

101.    As a direct and proximate result of Defendants' discriminatory conduct in violation of the FHA, Ms. Jones has suffered and continues to suffer substantial damages.

102.    Defendants' conduct was willful, intentional, and in reckless disregard of Plaintiff's civil rights.

103.    Ms. Jones is entitled to actual and punitive damages, attorneys' fees, and costs as a result of Defendants' discriminatory conduct, pursuant to 42 U.S.C. § 3613(c).

17

## FIFTH CAUSE OF ACTION
### NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 296(5)(a)(1)
### Against Defendants Collett and Gordon, in Their Individual Capacities

104.    Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

105.    The New York State Human Rights Law (NYSHRL) imposes a personal duty not to discriminate by making it unlawful for any "person having the right to … rent or lease a housing accommodation … or any agent or employee thereof, [t]o refuse to sell, rent, lease or otherwise to deny to or withhold from any person … such a housing accommodation because of the … disability … of such person."  N.Y. Exec. § 296(5)(a)(1).

106.    At all times relevant to this action, Defendants' campus housing constituted a housing accommodation "used or occupied or intended, arranged or designed to be used or occupied, as the home, residence, or sleeping place of one or more human beings" subject to the NYSHRL.  N.Y. Exec. § 292(10).

107.    At all times relevant to this action, Ms. Jones has been a person with a disability within the meaning of the NYSHRL.  N.Y. Exec. § 292(21).

108.    At the time of the discriminatory conduct alleged herein, Ms. Jones was qualified for and deemed eligible for Defendants' campus housing as a student enrolled full-time at Buffalo State.

109.    At all times relevant to this action, Defendants Collett and Gordon were individuals with the right to rent or lease Defendants' housing accommodation or were agents or employees of the entity with the right to rent or lease Defendants' housing accommodation.

18

110.    Defendants Collett and Gordon refused to rent, lease, or otherwise denied or withheld Defendants' campus housing from Ms. Jones because of her disability of HIV, without any reasonable basis, in violation of the NYSHRL.  N.Y. Exec. § 296(5)(a)(1).

111.    Defendants Collett and Gordon directly participated in the discriminatory conduct and decisions alleged herein, in violation of the NYSHRL.

112.    At the time of the discriminatory conduct alleged herein, Defendant Gordon was also a supervisor and was informed of the discriminatory conduct alleged herein but failed to take remedial measures to correct the NYSHRL violations.

113.    Following the discriminatory conduct alleged herein, Defendants have continued to offer, rent, and otherwise provide and make available campus housing to others.

114.    As a direct and proximate result of Defendants' discriminatory conduct in violation of the NYSHRL, Ms. Jones has suffered and continues to suffer substantial damages.

115.    Defendants' conduct was willful, intentional, and in reckless disregard of Plaintiff's civil rights.

116.    Ms. Jones is entitled to actual and punitive damages, attorneys' fees, and costs as a result of Defendants' discriminatory conduct, pursuant to N.Y. Exec. §§ 297(9)-(10).

## SIXTH CAUSE OF ACTION
### NEW YORK STATE HUMAN RIGHTS LAW, § 296(5)(a)(2)
### Against Defendants Collett and Gordon, in Their Individual Capacities

117.    Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

118.    The NYSHRL establishes that it is "an unlawful discriminatory practice" for any "other person having the right to sell, rent or lease a housing accommodation, constructed or to be constructed, or any agent or employee thereof: . . . (2) To discriminate against any person

because of . . . disability . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith." N.Y. Exec. § 296(5)(a)(2).

119.    At all times relevant to this action, Defendants' campus housing constituted a housing accommodation "used or occupied or intended, arranged or designed to be used or occupied, as the home, residence, or sleeping place of one or more human beings" subject to the NYSHRL.  N.Y. Exec. § 292(10).

120.    At all times relevant to this action, Ms. Jones has been a person with a disability within the meaning of the NYSHRL.  N.Y. Exec. § 292(21).

121.    At the time of the discriminatory conduct alleged herein, Ms. Jones was qualified for and deemed eligible for Defendants' campus housing as a student enrolled full-time at Buffalo State.

122.    At all times relevant to this action, Defendants Collett and Gordon were individuals with the right to rent or lease Defendants' housing accommodation or were agents or employees of the entity with the right to rent or lease Defendants' housing accommodation.

123.    Defendants Collett and Gordon discriminated against Ms. Jones because of disability in the terms, conditions, or privileges of the rental or lease of her housing accommodation and in the furnishing of facilities or services in connection therewith.  N.Y. Exec. § 296(5)(a)(2).

124.    Defendants Collett and Gordon directly participated in the discriminatory conduct and decisions alleged herein, in violation of the NYSHRL.

125.    At the time of the discriminatory conduct alleged herein, Defendant Gordon was also a supervisor and was informed of the discriminatory conduct alleged herein but failed to take remedial measures to correct the NYSHRL violations.

126.    Following the discriminatory conduct alleged herein, Defendants have continued to offer, rent, and otherwise provide and make available campus housing to others.

127.    As a direct and proximate result of Defendants' discriminatory conduct in violation of the NYSHRL, Ms. Jones has suffered and continues to suffer substantial damages.

128.    Defendants' conduct was willful, intentional, and in reckless disregard of Plaintiff's civil rights.

129.    Ms. Jones is entitled to actual and punitive damages, attorneys' fees, and costs as a result of Defendants' discriminatory conduct, pursuant to N.Y. Exec. §§ 297(9)-(10).

**SEVENTH CAUSE OF ACTION**
**THE CODE OF THE CITY OF BUFFALO, § 154-11**
**Against Defendants Collett and Gordon, in Their Individual Capacities**

130.    Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

131.    At all times relevant to this action, Ms. Jones had a physical or medical impairment resulting from a physiological condition, HIV, that prevents the exercise of her normal bodily functions, or that is demonstrable by medically accepted clinical or laboratory diagnostic techniques.

132.    Accordingly, at all times relevant to this action, Ms. Jones has had a disability within the meaning of Section 154-9 of the Code of the City of Buffalo.

133.    By their conduct as described herein, Defendants intentionally deprived Ms. Jones of the exercise of her civil rights, within the meaning of § 154-9, based on her disability, and

committed unlawful discriminatory practices that interfered with Ms. Jones' civil rights, including:

      a.  her attendance at a four-year college or university;

      b.  her use of housing accommodations;

      c.  her participation in and enjoyment of the benefits, services, privileges, programs, facilities, and activities provided by New York State; and

      d.  her exercising or attempting to exercise her right to enjoy the security of her own person.

134.    Ms. Jones is entitled to injunctive relief, damages, and reasonable attorneys' fees as a result of Defendants' discriminatory conduct, pursuant to the Code of the City of Buffalo, § 154-11.

## PRAYER FOR RELIEF

   **WHEREFORE,** Plaintiff requests that this Court:

1.    Declare that Defendants' conduct as alleged in the Complaint violates Plaintiff's rights under:

      a.  Title II of the ADA;

      b.  Section 504 of the Rehabilitation Act;

      c.  The Fair Housing Act;

      d.  Section 296 of the New York State Human Rights Law; and

      e.  The Code of the City of Buffalo.

2.    Enjoin Defendants and their directors, officers, agents, and employees from continuing to publish reference to a "judicial dismissal" in Plaintiff's transcript;

3.      Enjoin Defendants and their directors, officers, agents, and employees from providing any information in the transcript suggesting that Ms. Jones was suspended, dismissed, required to leave school, or otherwise disciplined;

4.      Direct Defendants and their directors, officers, agents, and employees to confirm that Ms. Jones departed in good standing if inquiries are made;

5.      Direct Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including by:

     a.    Ensuring the campus health center provides students with the most up to date medical information about HIV treatment, prevention, and transmission; and

     b.    Amending the Buffalo State University Code of Conduct to include a provision that conduct involving HIV or sexually transmitted infections will be assessed using the most up to date medical science and knowledge;

6.      Award to Plaintiff:

     a.    Compensatory damages to the extent allowed by law, including but not limited to loss of housing and emotional distress damages for mental pain and anguish, pursuant to the Fair Housing Act, New York State Human Rights Law, and the Code of the City of Buffalo;

     b.    Compensatory damages to the extent allowed by law, including but not limited to economic and expectation damages, including for lost opportunity, pursuant to Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973;

    c.  Punitive damages to punish Defendants for the willful, malicious, and reckless

       conduct alleged herein and effectively deter similar conduct in the future,

       pursuant to the Fair Housing Act and the New York State Human Rights Law;

    d.  Reasonable attorneys' fees and costs; and

    e.  Any and all other relief that this Court finds necessary and appropriate.

Dated: Buffalo, New York
      September 10, 2024

**ANNA MARIE RICHMOND**

  /s/Anna Marie Richmond

2500 Rand Building
14 Lafayette Square
Buffalo, NY 14203-1925
Tel: 716-854-1100
Email: annamarierichmondesq@gmail.com

**LEGAL ACTION CENTER**
Jennifer Sinton*
Diane Johnston*
225 Varick St., 4th Floor
New York, NY 10014
Tel: 212-243-1313
Email: jsinton@lac.org
Email: djohnston@lac.org

**HOUSING WORKS, INC.**
Armen H. Merjian*
81 Willoughby St., 5th Floor
Brooklyn, NY 11201
718-408-6502
Email: merjian@housingworks.org

*Pro Hac Vice application forthcoming*